DECISION AND JOURNAL ENTRY
{¶ 1} Appellant Lisa Kohler, M.D., the Chief Medical Examiner of Summit County, appeals the order of the Summit County Court of Common Pleas that directed Dr. Kohler to change her determination of the cause, manner, and mode of death with respect to three decedents. This Court affirms in part and reverses in part.
 I. {¶ 2} This appeal relates to the deaths of three men who died while in the custody of various law enforcement agencies in Summit County in 2005 and 2006. In each situation, law enforcement officers deployed TASER devices during their encounter with the decedent. Dr. Kohler opined that deployment of the TASER device contributed to each death. *Page 2 
 DENNIS HYDE {¶ 3} In the early hours of January 5, 2005, Dennis Hyde broke into a Triplett Boulevard home by shattering a window near the front door. Awakened by the noise, the occupant heard Hyde's footsteps on the stairs that led to her second-story bedroom. She called out to the unseen intruder, who responded that he was "the devil," her "worst nightmare," and threatened to kill her. She called 911 and remained in her bedroom and on the phone with the 911 operator while Hyde continued to move around her home. When officers John Ross and Anthony Kelley arrived on the scene, they found a broken front window and a trail of blood through the house. The house fell dark and the occupant, who answered the front door, informed police that the intruder must have turned the lights off from the basement circuit box.
 {¶ 4} Officers Ross and Kelley followed the trail of blood to the kitchen, where a knife drawer stood open, its contents partially emptied. The trail continued into the basement, where the officers relied on their flashlights to search for Hyde. His right arm was partially visible from behind the furnace, but the rest of his body was obscured. The officers could not determine whether he had a firearm. At that point Hyde appeared and,
 "began ranting about being the devil, that he was going to take the officers to meet his maker, and that they were all going to die and go to hell. Hyde also weirdly began projectile vomiting at [the officers]. Hyde would tell them he was going to vomit then, at will, projected the vomit at them. Hyde told the officers he had a gun and he was going to kill them."
Hyde refused to keep his hands above his head and, instead, threatened to throw a vase at the officers. Hyde was partially unclothed and covered with blood. Officer Ross discharged his TASER at Hyde's torso from a distance of approximately ten feet. Although Hyde fell to the ground momentarily, he was undeterred and "vaulted back up and started growling." As Hyde's behavior escalated further out of control, two other officers deployed their TASER devices. *Page 3 
Hyde fell backward, but continued to resist the officer's efforts to restrain him. An additional charge was delivered through previously-employed TASER wires, and Officer Ross administered a "drive stun," or a direct application of the TASER device to the body, to Hyde's lower back. Hyde continued to struggle as police placed his arms and legs in restraints and as EMS workers treated a gaping wound on his wrist.
 {¶ 5} Because EMS workers could not navigate the narrow basement stairway with a gurney, Hyde was carried from the basement. Hyde continued to communicate as officers lifted him. At some point near the bottom of the stairs, officers noted that Hyde was no longer actively resisting. He fell silent and, by the time he was placed on the paramedics' cot, was in "full arrest." Efforts to resuscitate Hyde proved unsuccessful.
 {¶ 6} Dr. George Sterbenz, a deputy medical examiner for Summit County, performed an autopsy of Hyde. Toxicology reports confirmed the presence of Oxycodone and Methamphetamine in Hyde's body. Dr. Sterbenz noted two "penetrating incised wounds" to Hyde's left wrist which transected the radial artery and "multiple tendons." He determined that the manner of Hyde's death was homicide and noted specifically that it was "[s]udden death incurred during restraint." Dr. Sterbenz's report, which was also signed by Dr. Kohler, elaborated:
 "The decedent was a 30 year old male who died due to a probable cardiac arrhythmia caused by the combined effects of methamphetamine intoxication and electrical pulse incapacitation. Blood loss from injuries sustained prior to the altercation and apparent underlying psychiatric illness are contributory factors to the death. Because the electro-muscular disruption effect of the M26 TASER is an `inflicted' force, the Manner of Death is ruled homicide."
 {¶ 7} Dr. Sterbenz listed the cause of death as "[p]robable cardiac arrhythmia" due to "[a]cute methamphetamine intoxication and electrical pulse incapacitation." He noted as *Page 4 
contributing conditions "[p]sychiatric disorder with agitated behavior; [b]lood loss by arterial injury."
 RICHARD HOLCOMB {¶ 8} Shortly before 1:00 a.m. on May 28, 2005, a Springfield Township property owner reported a disturbance on her property. Officer Kristina Albrecht responded and notified dispatch of her arrival at 12:54:47 a.m. Officer Albrecht heard screaming and requested backup, but then located a single individual, Richard Holcomb, on the property. She found Holcomb in a fenced horse pasture, naked from the waist up and gesturing as though swinging a baseball bat. Officer Albrecht approached the fence and tried to engage Holcomb in conversation. At that point, however, the situation took a turn for the worse. Officer Albrecht described what followed:
 "I then tried to have a conversation with this young man. He had no shirt on. He was wearing jeans. He wasn't making a lot of sense to me. I asked him his name. I asked him what he was doing, where he lived, if he was using drugs. He then proceeded to the fence line where I was at and got very close to my face, and I just described it as a look that he was looking through me. He had a look on his face that is almost indescribable.
 "I then asked him if he was on drugs. He said *** `Yes.' I said, `Have you been drinking?' `Yes.' And then he told me that somebody was going to die."
Holcomb turned and walked toward a barn, where he sat on the ground and began "rapping." According to Officer Albrecht, "[h]e then stopped and jumped up, and it was almost like slow motion. He came charging straight towards me." Officer Albrecht deployed her TASER. Holcomb fell to the ground, but rose to his feet again as soon as the five-second TASER cycle ended. Officer Albrecht deployed her TASER three more times.
 {¶ 9} After the final TASER deployment, Holcomb remained facedown on the ground. He was breathing, moaning, making other noises, and "moving on his own free will." Holcomb *Page 5 
was alert and responsive. Officer Jason Moore and Sergeant Joseph Gaffney arrived to provide backup to Officer Albrecht, and Holcomb was placed in handcuffs at that time. Approximately eight minutes elapsed between the time Officer Albrecht first deployed her TASER and Sergeant Gaffney's arrival on-scene at 1:05:22 a.m. As Officer Moore searched for Holcomb's identification, Holcomb appeared to lose consciousness. Sergeant Gaffney could not detect a pulse. Despite efforts to resuscitate him, Holcomb was declared dead at 2:05 a.m.
 {¶ 10} Dr. Dorothy Dean, a deputy medical examiner for Summit County, performed an autopsy of Holcomb. Toxicology reports confirmed the presence of Methamphetamine and Ecstasy (MDMA/MDA) in Holcomb's body. Dr. Dean noted the presence of several small abrasions on Holcomb's body but, other than the areas pierced by the TASER barbs, did not note other external injuries. She determined that the manner of Holcomb's death was homicide and noted specifically that it was "sudden death incurred during restraint." Dr. Dean's report, which was also signed by Dr. Kohler, elaborated:
 "After review of the investigative information and the autopsy findings, it is our opinion that Richard Thomas Holcomb died from a cardiac arrhythmia induced by the physiological stress caused by the use of methamphetamine and MDMA/MDA (Ecstasy, XTC). Contributing to his death, to some extent, were the electrical impulses delivered by the TASER while police attempted to arrest him. There was no evidence of asphyxia or blunt force injury. Because of the use of the TASER, the Manner of Death is ruled homicide."
Dr. Dean listed the cause of death as "[c]ardiac arrhythmia" due to "[d]rug induced psychosis" and "[d]rug (methamphetamine and MDMA/MDA) intoxication, acute." She listed "electrical pulse incapacitation" as the single other contributing condition.
 MARK MCCULLAUGH {¶ 11} On August 20, 2006, Mark McCullaugh was an inmate at the Summit County Jail following his arrest on charges that included assault on a police officer. McCullaugh had a *Page 6 
history of mental illness. Deputy Sheriffs entered McCullaugh's cell when they found him wearing only socks, pacing, and inflicting wounds on himself. An altercation between McCullaugh and the deputies ensued. At 5:30 p.m., Denise Walsh, a member of the jail's medical staff, observed McCullaugh in his cell at the request of a deputy sheriff. She noted that McCullaugh "was extremely agitated *** rambling incoherently" and "was naked in the room. He was holding onto his Bible. *** [H]e was drinking one glassful of water after another, asking me to move away from the window, advising me that he was praying to God that I would go away." After Ms. Walsh left the area of McCullaugh's cell, at least one deputy deployed a TASER device in an attempt to bring McCullaugh under control. Deputies successfully placed McCullaugh in handcuffs and shackled his legs, leaving him in a kneeling position next to his cot with his head resting on the mattress and arms secured behind his back. During the course of McCullaugh's outburst, his cell and its contents were fouled with blood and feces.
 {¶ 12} At 6:45 p.m., Ms. Walsh returned to McCullaugh's cell to administer injections of Geodon and Ativan. McCullaugh was alive when she entered his cell, and she noted "some head movement" and "moaning" when, as ordered, she injected the medications into McCullaugh's hip. Ms. Walsh was in McCullaugh's cell for "two minutes, if that" before she returned to her post. She arrived back at the infirmary at 6:55 p.m. to finish her dinner. At approximately 7:10 p.m., Ms Walsh received an urgent call to respond to McCullaugh's cell with a crash cart. At that time, McCullaugh did not appear to be alive. He was pronounced dead at 7:46 p.m. on August 20, 2006.
 {¶ 13} Dr. Sterbenz performed an autopsy of McCullaugh, a 28-year-old male weighing 290 pounds. Toxicology reports confirmed the presence of Geodon in McCullaugh's system, but did not detect a reportable concentration of Ativan. Dr. Sterbenz noted numerous diagnoses, *Page 7 
including evidence of chemical, mechanical, and electrical restraint; blunt force trauma of the head and neck; blunt force trauma of the torso; anal, genital, and perineal blunt force trauma; blunt force trauma of the extremities; and a "healing incised wound of the right hand." He determined that the manner of McCullaugh's death was homicide attributed to "[m]ultiple restraint mechanisms with beating and anal penetration." Dr. Sterbenz's report, which was also signed by Dr. Kohler, elaborated:
 "The decedent was a 28 year old male who reportedly died while in custody. The autopsy findings support death by mixed asphyxial mechanisms due to the combined effects of chemical, mechanical, and electrical restraint. Though the type of mechanical mechanism specifically indicated by the physical findings is that of a restrictive `hog-tie' position, the possibility of direct compression of the torso is not excluded to within a reasonable degree of certainty based solely upon the physical findings. Additionally, the autopsy findings demonstrate blunt force trauma consistent with a physical altercation. These blunt force injuries include anal, genital, and perineal injury consistent with forceful placement of a foreign object beyond the anal verge for an indeterminate depth of penetration. Several healing injury clusters are present, including a healing incised wound of the right hand. However, the majority of the injuries, including the anal injuries and the injuries incurred by restraint, appear `fresh'. The exact temporal sequence of these `fresh' injuries cannot be distinguished by autopsy examination alone. The postmortem toxicology findings indicate that the decedent either did not receive medication immediately prior to his death, or that the time from administration of the medication to death was insufficient for significant absorption of the medication. The Manner of Death is ruled homicide, in accordance with death due to injury inflicted by one or more individuals."
Dr. Sterbenz listed the cause of death as "[a]sphyxia" caused by "[t]he combined effects of chemical, mechanical and electrical restraint." He noted "[h]ypertensive arteriosclerotic cardiovascular disease" as a contributory condition.
 II. {¶ 14} On November 17, 2006, TASER International, Inc. ("TASER"), which manufactures and sells TASER devices, brought an action against Dr. Kohler captioned "Complaint to Correct Erroneous Cause of Death Determinations" pursuant to R.C. 313.19. The *Page 8 
complaint alleged, with respect to Hyde and Holcomb, that medical and scientific evidence demonstrated that the deployment of TASER devices neither caused nor contributed to the death. TASER requested that the trial court order Dr. Kohler "to remove all reference to any TASER© [electronic control device] (or `electrical pulse incapacitation') causing or contributing to the cause of death" with respect to each decedent. The trial court granted the City of Akron leave to intervene with respect to Hyde. On October 1, 2007, the trial court granted TASER leave to amend its complaint to include McCullaugh.
 {¶ 15} Following a four-day bench trial, the trial court entered judgment in favor of TASER and ordered Dr. Kohler to amend the death certificates in each case. With respect to Hyde and Holcomb, the trial court ordered changes in the manner of death from homicide to accidental and the removal of "any reference to `homicide' or contributing factor of electrical pulse incapacitation" from the death certificate and autopsy reports. With respect to McCullaugh, the trial court ordered that the manner of death be changed from homicide to undetermined, "and any reference to death by `Asphyxia due to the combined effects of chemical, mechanical and electrical restraint,' as well as any reference to `Homicide' due to `multiple restraint mechanisms with beating and anal penetration' shall be deleted from both the Death Certificate and the Report of Autopsy." Dr. Kohler timely appealed. Her seven assignments of error have been rearranged for ease of discussion.
 ASSIGNMENT OF ERROR VII "R.C. 313.19 violates [the] Due Process Clause of the Fourteenth Amendment of the Constitution of the United States and deprives individuals of their fundamental rights in violation of Sections 1 and 16 of Article I of the Bill Of Rights of the Ohio Constitution." *Page 9 
 {¶ 16} Dr. Kohler's seventh assignment of error is that R.C. 313.19
violates the constitutional right to due process held by third parties who may have an interest in the outcome of an action under the statute. Specifically, Dr. Kohler maintains:
 "R.C. 313.19 *** alters the rights of nonparties, without making any provisions for, or means for, persons adversely affected thereby to be made aware of the proceedings for the purpose of asserting and protecting their rights, whether that be their reputation right, or legal position in other possible proceedings, in which the cause-of-death determination is relevant. This impact is magnified, by the potential of multiple causes under the provision[s] of R.C. 313.19, which would allow multiple challenges to a death determination, over a never conclusive time frame, which could potentially shift back and forth the determination of cause of death, to a nonparty's detriment, without notice."
Dr. Kohler concedes that this issue was not raised in the trial court, but urges this Court to address it nonetheless. This Court, however, has consistently held that a constitutional error not raised in the trial court is forfeited and cannot be raised for the first time on appeal. See, e.g., State v. Honey, 9th Dist. No. 08CA0018-M, 2008-Ohio-4943, at ¶ 20-21. Dr. Kohler's seventh assignment of error is overruled.
 ASSIGNMENT OF ERROR I "The trial court erred when it determined that plaintiff TASER International, Inc. had standing to challenge the Medical Examiner's cause of death determination pursuant to R.C. 313.19."
 {¶ 17} Dr. Kohler's first assignment of error is that the trial court erred by denying its motion to dismiss TASER's complaint for lack of standing. Specifically, Dr. Kohler maintains that TASER did not demonstrate an injury-in-fact that could be redressed by application of R.C. 313.19. Dr. Kohler did not challenge Akron's standing with respect to the Hyde case.
 {¶ 18} Civ. R. 17(A) requires that an action be brought in the name of a real party in interest, one who "is directly benefited or injured by the outcome of the case rather than merely having an interest in the action itself." State ex rel. Sinay v. Sodders (1997),80 Ohio St.3d 224, *Page 10 
226, citing State ex rel. Massie v. Gahanna-Jefferson Pub. Schools Bd.of Edn. (1996), 76 Ohio St.3d 584, 585. An injury in fact is one that is specific, traceable to the subject matter of the suit, and capable of being redressed by the court. Fair Housing Advocates Assn., Inc. v.Chance, 9th Dist. No. 07CA0016, 2008-Ohio-2603, at ¶ 5. When an action is brought in relation to a specific statute or constitutional provision, the plaintiff must demonstrate that the interest he or she seeks to protect falls within the "zone of interests" that are protected or regulated. Id. The measure of standing under R.C. 313.19 is not that required for a declaratory judgment action. "Because R.C. 313.19
delimits the procedure for challenging a coroner's verdict, use of declaratory judgment to resolve those same issues is inappropriate."Perez v. Cleveland (1997), 78 Ohio St.3d 376, paragraph one of the syllabus (Perez II).
 {¶ 19} R.C. 313.19 provides:
 "The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death."
The statute encompasses two components. The first relates to the evidentiary value of a coroner's determination, establishing a "nonbinding, rebuttable presumption" in favor of a coroner's determination of the cause, manner, and mode of death. Vargo v.Travelers Ins. Co., Inc. (1987), 34 Ohio St.3d 27, paragraph one of the syllabus. The second, which is at issue in this case, establishes a means through which the conclusions of a coroner may be challenged.Perez II at 377.
 {¶ 20} R.C. 313.19 does not limit the scope of challenges to a cororner's determination, the purpose for which challenges are brought, or the persons who may bring a challenge. *Page 11 LeFever v. Licking Cty. Coroner's Office, 5th Dist. No. 06-CA-13,2006-Ohio-6795, at ¶ 19. By its nature, R.C. 313.19 requires this broad interpretation. The interest protected by the statute is the accuracy of the coroner's verdict and death certificate, which are matters of public record and of great consequence given the evidentiary presumption that attaches to the coroner's finding. A review of cases brought under R.C. 313.19 demonstrates a diversity of interests that may give rise to standing, including damage to personal and professional reputation of the plaintiff (Perez v. Cleveland (1993), 66 Ohio St.3d 397, 399, (Perez I) abrogated on other grounds by Perez II at paragraph one of the syllabus); posthumous damage to reputation of the decedent or impairment of an estate's ability to collect insurance proceeds (Estate of Holleyv. Am. Family Life Assur. of Columbus, 4th Dist. No. 04CA5,2005-Ohio-2281; Estate of Severt v. Wood (1995), 107 Ohio App.3d 123;Kerns v. Sybert (Aug. 25, 1980), 11th Dist. No. 966); and post-conviction or post-acquittal interests of criminal defendants (Perez I, 66 Ohio St.3d 397; LeFever, 2006-Ohio-6795; Bozsik v.Grabenstetter, 9th Dist. No. 04CA0030-M, 2004-Ohio-6750).
 {¶ 21} In this case, Mr. Patrick Smith, the founder and chief executive officer of TASER International, testified at trial that TASER had been sued by the estate of each decedent at issue in this case and confirmed that the cases were dismissed by the respective plaintiffs without providing further detail. Mr. Smith described the implications of coroners' rulings on in-custody deaths for TASER and for the law enforcement agencies that utilize the TASER technology and identified the public policy concerns at issue. Given the breadth of the interests that are recognized under R.C. 313.19, and mindful of the Sixth District Court of Appeal's decision in LaFever, we cannot conclude that TASER lacked standing to bring this action. Dr. Kohler's first assignment of error is overruled. *Page 12 
 ASSIGNMENT OF ERROR VI "The trial judge committed plain error and abused its discretion in prohibiting the Summit County Medical Examiners from testifying as [to] the basis of their findings as to cause of death set forth in their official reports."
 {¶ 22} In her fourth assignment of error, Dr. Kohler argues that the trial court's decision to limit her testimony and the testimony of deputy medical examiners Dr. George Sterbenz and Dr. Dorothy Dean constituted plain error. By so arguing, it appears that Dr. Kohler concedes that no offer of proof was made at the time of the trial court's evidentiary ruling. Neither Dr. Kohler nor the appellees, however, have clarified the issue for this Court. A review of the events at trial is therefore necessary.
 {¶ 23} TASER called Drs. Kohler, Dean, and Sterbenz on cross-examination during presentation of its case-in-chief. On the third day of trial, after TASER and Akron finished presenting their cases in-chief, TASER moved to limit the testimony of all three medical examiners "on the basis that they have not complied, they will not comply with Rule of Evidence 702 in terms of scientific reliability." Counsel for Dr. Kohler did not provide argument opposing the motion. The trial court declined to rule on TASER's motion at that time, but instructed TASER to object to specific instances of testimony during the direct examination of each witness. TASER did so, on the basis that the medical examiners lacked knowledge of the "physiological effects of TASER electronic control devices." The trial court sustained one such objection with respect to Dr. Kohler, four with respect to Dr. Dean, and two with respect to Dr. Sterbenz.
 {¶ 24} Evid. R. 103 explains when an error in excluding evidence may be raised:
 "Error may not be predicated upon a ruling which *** excludes evidence unless a substantial right of the party is affected, and
 "*** *Page 13 
 "(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Offer of proof is not necessary if evidence is excluded during cross-examination."
An adequate offer of proof contains two elements:
 "First, the offering party must inform the trial court as to the legal theory upon which admissibility is proposed. Second, an offering party must show what a witness was expected to testify to and what that evidence would have proven or tended to have proven. While the proffer of the expected testimony need not be as specific as the testimony itself would have been it must nonetheless be sufficient to enable the reviewing court to determine roughly what, if any, impact the testimony may have had upon the final disposition of the case." (Internal citations omitted.) Moser v. Moser (1991), 72 Ohio App.3d 575, 580.
In this case, Dr. Kohler did not proffer the substance of the excluded testimony and, consequently, it can only be assigned as error if "the substance of the [testimony] *** was apparent from the context within which questions were asked." Id. The context of Drs. Kohler, Dean, and Sterbenz's testimony must demonstrate, in the absence of an adequate proffer, the legal theory upon which its admissibility was based and the nature of the testimony itself. Id.
 {¶ 25} In examining the context for the medical examiners' testimony, we are mindful that the trial court excluded portions of their testimony pursuant to Evid. R. 702, which provides:
 "A witness may testify as an expert if all of the following apply:
 "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; *Page 14 
 "(2) The design of the procedure, test, or experiment reliably implements the theory;
 "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
Medical examiners may qualify as expert witnesses who may express opinions on matters within their scope of expertise. See State v.Heinish (1990), 50 Ohio St.3d 231, 234. With respect to that testimony, however, the requirements of Evid. R. 702(C) must be met. In other words, the testimony of a medical examiner who is qualified as an expert witness in the field of forensic pathology must nonetheless be based on "reliable scientific, technical, or other specialized information" to the same extent as any other expert witness. See, generally, Evid. R. 702(C).
 {¶ 26} The substance of the excluded testimony is not apparent from the context in this case, which neither identifies the legal theory upon which its admissibility was based nor the nature of the excluded testimony. With respect to the legal theory at issue, Dr. Kohler did not propose grounds for admissibility other than satisfying the requirements of Evid. R. 702(C). Considered in light of that rule, however, this Court cannot discern whether or how the indices of reliability of Evid. R. 702(C) might have been satisfied. Considering the medical examiners' testimony on cross-examination during TASER's case in chief does little to shed light on the issue. The stipulated facts are equally unhelpful because, with respect to Hyde and Holcomb, the parties stipulated that neither Dr. Dean nor Dr. Sterbenz could opine to a reasonable degree of medical certainty how use of the TASER devices contributed to the death.
 {¶ 27} Because Dr. Kohler did not place an offer of proof on the record with respect to her own testimony and the testimony of Drs. Dean and Sterbenz, and because neither the legal theory of admissibility nor the substance of the excluded testimony is apparent from the context, *Page 15 
the trial court's decision to exclude the testimony under Evid. R. 702 cannot be assigned as error on appeal. Dr. Kohler's sixth assignment of error is overruled.
 ASSIGNMENT OF ERROR III "The trial court erred in requiring specific medical, scientific, or electrical evidence to support the medical examiners conclusion that TASERs contributed to the death of Dennis S. Hyde, Richard Holcomb, or Mark D. McCullaugh."
 ASSIGNMENT OF ERROR IV "The trial court erred in finding that competent, credible evidence had been presented sufficient to overcome the presumption of validity applied to the medical examiner's decision."
 ASSIGNMENT OF ERROR V "The trial court erred in determining there was no medical scientific or electrical evidence to support the conclusion that TASERs contributed to the deaths of the decedents herein."
 {¶ 28} Dr. Kohler's third, fourth, and fifth assignments of error argue that the trial court erred by ordering the amendment of the cause of death in each case. Specifically, Dr. Kohler has argued that the trial court neglected the presumption that attaches to the coroner's determination of cause of death, improperly required "medical, scientific or electrical evidence" to support the coroner's determinations, and incorrectly evaluated the evidence. These assignments of error challenge aspects of the trial court's conclusions as the trier of fact and, although the assignments of error purport to argue different standards of review, the substance of each argues that the trial court abused its discretion in reaching its ultimate conclusions. For this reason, these assignments of error are combined for ease of disposition.
 {¶ 29} The Supreme Court of Ohio has concluded that "[t]he coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." Vargo,34 Ohio St.3d 27 at *Page 16 
paragraph one of the syllabus. Thus, one function of R.C. 313.19 is to set forth the presumptive value of a coroner's determination as evidence in civil and criminal cases in which the cause, manner, and mode of death are at issue. See Perez II, 78 Ohio St.3d at 539. See, also,Reidling v. Valle (1999), 132 Ohio App.3d 310 (applying the nonbinding rebuttable presumption in a civil wrongful death action); State v.Beaver (1997), 119 Ohio App.3d 385, 392 (addressing the role of the nonbinding rebuttable presumption in a criminal case).
 {¶ 30} The second function of R.C. 313.19, as noted in our discussion of Dr. Kohler's first assignment of error, is to provide a means for judicial review of a coroner's decision. In actions brought for this purpose, the evidentiary presumption affords "much weight" to the coroner's factual determinations, but does not elevate the burden of proof beyond a preponderance of the evidence or require the trial court to review the coroner's determination for an abuse of discretion. SeeEstate of Severt, 170 Ohio App.3d at 131-32, quoting Vargo at 30. As the Supreme Court explained in Vargo:
 "[W]hile the coroner's factual findings are not conclusive, neither are they a nullity. The coroner is a medical expert rendering an expert opinion on a medical question. Therefore, to rebut the coroner's determination, as expressed in the coroner's report and the death certificate, competent, credible evidence must be presented." Id. at 229.
Consequently, the party who challenges a coroner's determination under R.C. 313.19 "[bears] the burden of establishing, by a preponderance of competent, credible evidence to the contrary, that the coroner's opinion was inaccurate." Estate of Severt at 129.
 {¶ 31} On appeal, a trial court's decision in an action authorized by R.C. 313.19 is reviewed for an abuse of discretion. Estate ofSevert at 132. We agree with the Severt court's conclusion in this regard, but note that the standard of review articulated in that case confuses the concepts of sufficiency and abuse of discretion. See id. at 132 ("[W]e cannot say that the trial *Page 17 
court abused its discretion when it found [the decedent's] cause of death to be uncertain. *** [A] reviewing court may not find an abuse of discretion and reverse a judgment supported by some competent, credible evidence.") Instead, when applying an abuse of discretion standard, this Court must determine whether the trial court's decision was arbitrary, unreasonable, or unconscionable — not merely an error of law or judgment. See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. We cannot conclude that the trial court abused its discretion in this case.
 {¶ 32} Prior to trial, the parties submitted twelve pages of stipulated facts numbered 1-149. The last of these stipulations helps to frame the issue that was before the trial court:
 "149. The Medical Examiner stipulates that none of the Decedents (Hyde, Holcomb, or McCullaugh) died from the immediate induction of ventricular fibrillation ("VF") from the application of a TASER Device."
Testimony at trial established that the mechanism through which death by electrocution occurs is the immediate onset of ventricular fibrillation, or sudden cessation of all electrical activity in the ventricles of the heart. In light of these stipulations, the issue before the trial court was whether TASER devices contributed to the deaths of Hyde, Holcomb, and McCullaugh through a mechanism other than ventricular fibrillation. The parties also stipulated that there were limitations on the medical examiners' opinions in these cases:
 "63. The Medical Examiner accepted the citation of the TASER Device because it was used near the time of Hyde's death. (Kohler Dep., pp. 89-90, 95)
 "64. Sterbenz has no opinion, to a reasonable degree of medical certainty, as to how the TASER Device purportedly contributed to Hyde's drug-induced death.
 ***
 "66. Sterbenz admits that there were other physiological stresses on Hyde, many not listed in the Medical Examiner's Report of Autopsy. [Sterbenz Dep.] at 177-78.
 *** *Page 18 
 "118. Dean speculates that the TASER Device application `contributed to Holcomb's death in some way, in some manner, to some extent.' (Dean Dep., p105) She stated, `How much, I don't know. I can't know.' (Id. at 105) Dean admits that the phrase `to some extent' in her autopsy report is not a precise medical term and that she is unable to say to what extent. (Id. at 113)
 "119. Dean is unable to say, to a reasonable degree of medical certainty, the mechanism by which electrical impulse delivered by the TASER Device contributed to Holcomb's death. (Dean Dep., p 106)"
The medical examiners' testimony confirmed the content of the stipulations.
 {¶ 33} Dr. Sterbenz, who performed the autopsies of Hyde and McCullaugh, testified that his examination of statements provided by the Akron Police Department led him to characterize Hyde's behavior before his death as "psychologically abnormal," and he confirmed the presence of Oxycodone and methamphetamine in Hyde's body. Dr. Sterbenz explained that he "used usual and normally accepted certification principles" to "derive[] the cause of death" and came to the conclusion that "electronic pulse incapacitation is a weapon inflicting a significant force upon Mr. Hyde" that acted "in concert" with drug intoxication to cause Hyde's death. He clarified on cross-examination that he did not believe that use of the TASER device was an independent cause of Hyde's death.
 {¶ 34} Dr. Sterbenz testified that he viewed the TASER device as an "inflicted force that results in an injury" and explained that he viewed the passage of time between the infliction of the force and death as largely irrelevant:
 "Your Honor, there is no time period from which an inflicted force that results in an injury and then later brings about or contributes to death would not be considered part of that mechanism of death.
 "So if the TASER, for example, resulted in the individual falling down striking their head and receiving a head injury, that later results or contributes to their death 30 years later, that application of the TASER would still forensically be considered even 30 years later. ***
 *** *Page 19 
"My testimony is if an injury is inflicted, and it does contribute to death, [the] interval from the time of the infliction to the time of death is irrelevant."
As stipulated, Dr. Sterbenz confirmed that he did not have an opinion, to a reasonable degree of medical certainty, regarding the "specific mechanism" through which the TASER device contributed to Hyde's death.
 {¶ 35} With respect to the autopsy of McCullaugh, Dr. Sterbenz explained that McCullaugh's body exhibited signs of placement in a prone position and testified that his face and airway displayed chemical burns. He opined that those factors, in combination with "electrical restraint," led to death by asphyxia. On cross-examination, Dr. Sterbenz testified that he did not know when during the events prior to McCullaugh's death that a TASER device was employed by law enforcement. Dr. Sterbenz was also questioned about the mechanism by which use of a TASER device could lead to asphyxia:
 "Q: Now, Doctor, you're unaware of any peer-reviewed scientific, medical, or engineering literature that supports the opinion that a TASER electronic control device can cause asphyxia in humans, correct?
 "A: That's correct. There is scientific evidence — well, it is evidence that electricity can contribute to asphyxia or can cause death through asphyxial mechanisms, but I have no knowledge of electricity specifically from TASER, TASER electricity specifically, contributed to asphyxia[.] ***
 ***
 "I don't know of anyone who specifically said the electricity from a TASER will cause death."
Dr. Sterbenz also confirmed that he could not tell in the course of an autopsy whether deployment of a TASER probe had been successful.
 {¶ 36} Dr. Dean testified regarding the autopsy of Holcomb. She noted that Holcomb's body bore marks from TASER probes on the left side of his torso, "just beneath and to the left of his left nipple, and *** just slightly above his left hip bone." She attributed significance to these *Page 20 
marks because they "span[ned] the diaphragm." Dr. Dean noted that one TASER probe appeared to have pierced the skin to a depth of one-quarter inch and opined that Holcomb "received four discharges for a total of 21 seconds, and *** that caused him to stop breathing." She agreed, however, that her autopsy report noted no evidence of asphyxia. Dr. Dean expressed her opinion that deployment of a TASER device as part of the struggle contributed to Holcomb's demise, but that use of handcuffs as a form of mechanical restraint during the struggle did not.
 {¶ 37} During cross-examination, Dr. Dean admitted that the autopsy of Holcomb was her first involving the subject of a TASER deployment and that, prior to the autopsy, she did no research into TASER devices. She testified that she did not know how a TASER device operates and had done no investigation or research to familiarize herself with the device before conducting the autopsy. Dr. Dean reiterated that Holcomb was in a state of psychosis induced by methamphetamine and Ecstasy and that his death was consistent with a state of excited delirium.
 {¶ 38} TASER presented the testimony of nine expert witnesses whose fields of expertise included toxicology, anatomic pathology, emergency medicine, cardiovascular medicine, electrophysiology, and forensic pathology. Among these experts were Jeffrey Ho, Michael Evans, Charles Wetli, Richard Fogel, Vincent DiMaio, and Mark Kroll.
 {¶ 39} Dr. Jeffrey Ho, an emergency room physician and deputy sheriff, testified regarding his research into the physiological and cardiovascular effects of TASER deployment on human subjects. He testified that he had not observed cardiac disrythmias or respiratory impairments following TASER deployment, including prolonged deployments of up to forty-five seconds. He also summarized his research regarding human subjects who exercised to the point of exhaustion before TASER deployment and concluded that the results did not demonstrate adverse effects. *Page 21 
 {¶ 40} Dr. Michael Evans, a toxicologist, defined excited delirium, also known as drug-induced psychosis when its onset is the result of drug use, as "agitation excitation," in which an individual "is not coherent, is not able to respond appropriately to commands, generally accompanied by hypothermia *** [and] bizarre behavior." He observed that individuals who are in a state of excited delirium frequently remove clothing. Dr. Evans testified that the behavior of Hyde and Holcomb was consistent with excited delirium and further described the characteristics of the state:
 "It's delirium. They're not cognizant of things around them. They're acting delirious in terms of activity. They would not — they would not respond to verbal commands. They're excited, agitated *** delirious, delusional *** physically active.
 "They appear to have — they do have increased strength, so they're difficult to restrain because of their — apparently of an increased strength beyond normal proportions."
Dr. Evans testified that there is no uniformly lethal level at which the drugs ingested by Hyde and Holcomb is fatal, and attributed this fact to variations in tolerance among individual users. With respect to McCullaugh, Dr. Evans also agreed that the decedent's behavior indicated a state of excited delirium as a result of his pre-existing psychiatric condition. He also testified that Geoden, which had been administered prior to his demise, has known contraindications including that it "will alter the rhythm of the heart *** a potentially lethal type of heart arrhythmia."
 {¶ 41} Dr. Charles Wetli, a forensic pathologist who has served as the deputy chief medical examiner for Dade County, Florida and the chief medical examiner and director of forensic sciences for Suffolk County, New York, testified regarding his expertise in the field of causes and mechanisms of death in cases related to drug abuse. Dr. Wetli noted that his research interest lies in the study of drug abuse and in-custody deaths. He defined excited delirium in a manner consistent with Dr. Evans: *Page 22 
 "Delirium is basically an abnormal mental state where you have disorientation as to time and place and is frequently accompanied by hallucination. It may be stuperous *** or agitated in which cases the person is very hyperstimulated, violent, and exhibits unexpected strength.
 "These individuals also have a tendency to smash glass, inappropriate disrobing, and [in] many instances they also have high core body temperatures."
Dr. Wetli testified specifically with respect to Dennis Hyde and concluded that his cause of death was "methamphetamine-induced excited delirium." He noted the Hyde displayed the telltale characteristics, including that Hyde was "totally impervious to pain" and exhibited an "apparent increase in strength [that] enabled him to fight off a number of police officers for a prolonged period of time." Dr. Wetli also explained that in excited delirium fatalities, it is common for the decedent to "continue to thrash about and yell and scream and fight, even though they are restrained at that particular point" before experiencing a "sudden loss of vital signs."
 {¶ 42} Dr. Wetli described the effects excited delirium on the body as akin to exercise physiology:
 "In the case of people in excited delirium, they are expending tremendous amounts of energy over a prolonged period of time, and this is going to cause an increase in hormones known as catecholamines, basically adrenaline, and high levels of those which are sustained.
 "As the intense physical activities continues [sic], lactic acid generated by the muscles builds up in the blood and begins to drop the Ph of the blood so your blood is becoming essentially more acid. It's also thought that our wide shifts in potassium, in either very high potassium or very low potassium, actually interferes with the heart rate.
 "Finally the — when the intense physical exertion ends, the normal physiological response is to get a marked increase not only in adrenalin but also in a hormone called noradrenalin. Noradrenalin function can constrict blood vessels in the skin and muscle and shunt that blood in the central part of the body. It is also known to be able to stop the heart.
 * * * *Page 23 
 "So it's usually during a calming-down phase that you suddenly lose vital signs. It's losing — it's like flipping out a light switch, and the internal rhythm, the initial rhythm that the EMS finds is generally asystole, meaning a flat line EKG."
Dr. Wetli considered several possible ways in which deployment of a TASER device could have affected Hyde and rejected each. He also testified that the state of excited delirium rendered Hyde less sensitive to the effects of the TASER device because "[h]e was in a state of delirium, in fact agitated delirium, so — and by definition of delirium you're not aware of your surroundings and understanding the significance of your surroundings." Dr. Wetli testified that he was not aware of any studies that would indicate that TASER deployment could lead to death in humans. Finally, he testified that the lapse of time between TASER deployment and death is significant:
 "Once you have a minute or more difference between a deployment of TASER and the sudden death of [an] individual, that length of time virtually precludes the TASER of having any effect because of what we know about electricity."
In short, Dr. Wetli noted that the passage of time "eliminates the perception of cause and effect."
 {¶ 43} TASER's experts explained that electricity causes sudden cardiac death in one way: by immediate ventricular fibrillation within a matter of seconds. Dr. Richard Fogel, a cardiologist and eletrophysiologist, explained that ventricular fibrillation occurs when there are "multiple short circuits that happen in this well-coordinated electrical system" of the human heart. Dr. Fogel noted that patients who experience ventricular fibrillation can be resuscitated. Dr. Fogel emphasized that the effect of electricity on the body is "immediate" and testified that the only means through which TASER deployment could, in theory, contribute to death would be by ventricular fibrillation:
 "Well, I don't understand how the TASER was implicated. It's very straightforward to me. If you're going to implicate the TASER, you're going to have to say that an electric shock caused ventricular fibrillation and that the patient had a cardiac arrest as a result of the ventricular fibrillation. The TASER *Page 24 
shock to the induction of ventricular fibrillation would be almost immediate and, from the onset of ventricular fibrillation to loss of consciousness would be within, you know, three to five to eight seconds. If they're struggling, if there is a pulse felt, if there is consciousness maintained after 10 seconds, maybe 15 at the wildest outset, then the TASER could not have caused ventricular fibrillation."
Turning to each of the decedents at issue, Dr. Fogel noted that none of them presented with ventricular fibrillation. Dr. Fogel also observed, regardless, that "the overwhelming evidence as it's being generated is coming to the conclusion that TASERs don't induce ventricular fibrillation in humans." He also contrasted the presenting cardiac rhythm of ventricular defibrillation with that of a subject presenting asystole — "which means no cardiac electrical activity at all."
 {¶ 44} Mark Kroll, an electrophysiologist, noted another distinction. Mr. Kroll agreed that the mechanism through which electricity causes death is ventricular fibrillation occurring within a matter of seconds. He explained that, physiologically, "[d]epending on their posture, they will pass out within five to 15 second[s]. If they're standing, it would be on the order of five seconds. If they're laying down, could be as much as 15 seconds." Mr. Kroll testified that in Holcomb's case, the automated electronic defibrillator (AED) was sufficiently sophisticated to record "an exact rhythm" during attempts to resuscitate Holcomb. The AED recorded "pulseless electrical activity" (PEA), which he characterized as inconsistent with ventricular fibrillation.
 {¶ 45} Dr. Vincent DiMaio, who is board certified in anatomical, clinical, and forensic pathology, agreed with these assessments. Dr. DiMaio testified that his research expertise is in the field of excited delirium, particularly in connection with in-custody deaths. He also acknowledged that he is the author of a forensic text on excited delirium upon which Dr. Kohler relied in these cases. Dr. DiMaio opined that TASER devices were part of the struggle between *Page 25 
the decedents and law enforcement, but that they were not temporally related to the deaths. Dr. DiMaio summarized his concerns with the Dr. Kohler's determinations in these cases:
 "Assertions are made, but there's no scientific articles, there's no scientific work backing up their opinions. And even, again, as I said, if you accept things that, you know, the [TASER] can, can cause an *** arrhythmia, which, again, there's no proof in humans, it doesn't fit the scenario of what happened in these three cases. *** These people died because they were in Excited Delirium Syndrome. They had an overdose of adrenalin, and that's what they're dying of, an overdose of adrenalin, an overstimulation of their heart so that they went into an arrhythmia, and in two of the instances it's due to methamphetamine, and in one it's due to schizophrenia."
Dr. DiMaio testified that he had ruled out use of the TASER devices as a contributing factor in each death and noted that, in his opinion, "these aren't really even difficult cases."
 {¶ 46} Having considered the voluminous record in this case, we cannot conclude that the trial court abused its discretion. TASER presented expert testimony from a variety of disciplines, and each expert testified that, based on his respective field of expertise, deployment of TASER devices did not contribute in any way to the deaths of Hyde, Holcomb, and McCullaugh. TASER's experts also rejected three theories of causation advanced by Dr. Kohler: (1) impaired respiration and asphyxia caused by contraction of the muscles in the diaphragm; (2) acidosis brought about by TASER deployment; and (3) the possibility that the decedents were "scared to death" by apprehension of TASER deployment.
 {¶ 47} It is important to emphasize that we reach this conclusion based on the record before us in this case, in which Drs. Kohler, Sterbenz, and Dean testified that they did minimal investigation into the issues presented by the Hyde, Holcomb, and McCullaugh deaths in conjunction with rendering their decisions. In this respect, we note again the parties' stipulations, with respect to Hyde and Holcomb, that the medical examiners could not opine to a *Page 26 
reasonable degree of scientific certainty the mechanism through which TASER deployments contributed to the deaths.
 {¶ 48} The trial court did not abuse its discretion by ordering, with respect to Hyde and Holcomb, that the manner of death be changed from homicide to accidental and by ordering the removal of "any reference to `[h]omicide' or contributing factor of electrical pulse incapacitation" from the death certificate and autopsy reports in those cases. With respect to McCullaugh, the trial court did not abuse its discretion by ordering that the manner of death be changed from homicide to undetermined. Similarly, the trial court did not abuse its discretion by ordering the removal of any reference to "electrical restraint" with respect to McCullaugh. Dr. Kohler's third, fourth, and fifth assignments of error are overruled.
 ASSIGNMENT OF ERROR II "The trial court erred in regard to the report of autopsy and death certificate of Mark D. McCullaugh by ordering any reference to Death by asphyxia due to the combined effects of chemical and mechanical restraints, and any reference to homicide due to multiple restraint mechanisms with beating and anal penetration deleted."
 {¶ 49} Dr. Kohler's second assignment of error argues that the trial court went beyond the scope of the complaint and the evidence presented at trial and abused its discretion by ordering the removal of language from the death certificate and autopsy that pertained to chemical and mechanical restraint, beating, and anal penetration. We agree.
 {¶ 50} Dr. Kohler correctly points out that, during trial, the trial court admonished the parties to confine testimony to the matter of TASER device involvement in McCullaugh's death. The parties likewise agreed that the other circumstances surrounding McCullaugh's death were not at issue, and apart from passing references to the significance of these facts in the experts' testimony and reports, evidence was not heard on these subjects. Under these circumstances, it *Page 27 
was an abuse of discretion for the trial court to go beyond the pleadings and the evidence presented at trial and to order the removal of "any reference to death by `Asphyxia due to the combined effects of chemical [and] mechanical, restraint'" and references to "multiple restraint mechanisms with beating and anal penetration." Dr. Kohler's second assignment of error is sustained.
 {¶ 51} Dr. Kohler's first, third, fourth, fifth, sixth, and seventh assignments of error are overruled. Her second assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed in part and reversed in part. Judgment affirmed in part and reversed in part.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed equally to appellant and appellee TASER International. Inc. *Page 28 
WHITMORE, J., CONCURS.